UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

JUAN ANTHONY ROSEBAR,

Defendant.

Criminal Action No. TDC-14-0484

**MEMORANDUM OPINION**

On October 27, 2014, Defendant Juan Anthony Rosebar ("Rosebar") was indicted for possession with intent to distribute heroin, 21 U.S.C. § 841(a), possession of a firearm in furtherance of drug trafficking, 18 U.S.C. § 924(c), and possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1). Those charges stem from a search pursuant to a warrant of Rosebar's apartment, which revealed 16.5 grams of heroin, 2.7 grams of marijuana, assorted drug paraphernalia, over $5,000 in cash, and a .40 caliber pistol. Rosebar has moved to suppress a statement he made to law enforcement during the search on the grounds that (1) he made the statement while in custody and in response to a question from an officer, but before receiving warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966), and (2) his statement was involuntarily made, in violation of the Due Process Clause of the Fifth Amendment. In response, the Government has asserted that the officer's question was permissible under the public safety exception to the *Miranda* requirement, and that Rosebar's statement was voluntary. The Court held a hearing on the Motion, as well as on a separate Motion to Suppress Tangible and

Derivative Evidence, on April 15, 2015.[1] The evidence presented on this Motion consists of the testimony of Officer Brendan Taylor of the Prince George's County Police Department and a number of exhibits. Upon consideration of the briefs, the evidence presented at the hearing, and the oral argument of counsel, the Motion to Suppress Statements is GRANTED, and Rosebar's statement is SUPPRESSED.

## FINDINGS OF FACT

On April 25, 2014 at approximately 6:00 a.m., officers from the Prince George's County Police Department executed a search warrant, which authorized a search for heroin and other controlled dangerous substances, drug paraphernalia, and firearms, on Rosebar's apartment in Oxon Hill, Maryland. Officers used a battering ram to force open the door, and about 10 members of the Department's Emergency Services Team ("EST"), dressed in SWAT gear, entered the apartment first, likely with their firearms drawn. The EST conducted a protective sweep of the apartment, looking specifically for any individuals, but did not otherwise search the premises. The EST found Rosebar in the hallway, dressed only in a tank top and boxer shorts, and discovered Rosebar's fiancée and their young son in bed. The officers then moved the three occupants to the living room of the apartment and seated them on dining room chairs outside the kitchen. Once the EST officers determined there were no other people in the apartment, which took about five minutes, they departed.

As the EST officers left, a separate search team began to enter. The search team consisted of about seven armed officers, all of whom were in plainclothes with the exception of Officer Brendan Taylor, who was wearing a police uniform and a bulletproof tactical vest. Officer Taylor was a member of the Special Assignment Team, and, as such, was responsible for

---

[1] The Motion to Suppress Tangible and Derivative Evidence was based on the assertion that the search warrant was invalid. The Court denied that motion at the April 15, 2015 hearing.

2

keeping Rosebar under observation to ensure the safety of his fellow officers while they searched the premises. Officer Taylor and a plainclothes detective were the first members of the search team to enter the apartment. Although armed, they did not have their firearms drawn.

When they walked in, they saw Rosebar, his fiancée, and their son still seated on chairs in the living room, with Rosebar facing them. Rosebar was not handcuffed. Rosebar was not attempting to leave his chair, and his demeanor was not belligerent. As Officer Taylor stood nearby, the detective asked Rosebar if there were "any guns or bombs in the apartment." Test. Ofc. Brendan Taylor, Hearing on Motions to Suppress, *United States v. Rosebar*, No. TDC-14-cr-0484, at 11:52:a.m. (D. Md. Apr. 15, 2015). Rosebar responded that there was a gun in the closet.[2] At the time, Rosebar had not received *Miranda* warnings. The officers had not told him that he was free to leave, nor had they told him that he was not free to leave. Although Rosebar was not at that point officially under arrest, Officer Taylor would not have let him leave the apartment.

The search then proceeded, with Officer Taylor continuing to stand watch over Rosebar. When the officers had recovered heroin, approximately 15 minutes later, Officer Taylor placed Rosebar under arrest, handcuffed him, and escorted him to a police cruiser.

## DISCUSSION

### I. *Miranda* Rights

Rosebar argues that his statement referencing a gun in the closet should be suppressed because at the time he made the statement, he was subject to a custodial interrogation but had not

---

[2] Rosebar made two additional statements: he told his son he was "sorry" and told his fiancée that he loved her. Test. Ofc. Brendan Taylor at 11:51 a.m. Neither of these statements was made in response to police questions. At the evidentiary hearing, defense counsel confirmed that Rosebar is not seeking suppression of these statements.

3

been read his *Miranda* rights. The Government contends, first, that Rosebar was not in custody,[3] and second, that even if he was in custody, the question was permissible under the public safety exception to the *Miranda* rule.

### A. Custodial Interrogation

The test for whether an individual is "in custody" such that *Miranda* warnings are required is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010). The analysis requires a court to determine, "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Thus, the operative question is whether "a reasonable man in the suspect's position would have understood his position" as being "in custody." *Berkemer*, 468 U.S. at 442; *Hargrove*, 625 F.3d at 178. Because the test is an objective one, "the subjective views harbored by either the interrogating officers or the person being questioned are irrelevant." *United States v. Hashime*, 734 F.3d 278 (4th Cir. 2013).

Here, objective indicators collectively establish that Rosebar was in custody for purposes of *Miranda* when the detective asked him whether there were any guns or bombs in the apartment. Rosebar had just been subjected to a sudden, forced entry of his apartment at 6:00 a.m. by 10 armed EST members, in SWAT gear, who used a battering ram to enter, rounded up him, his fiancée, and young son, and moved them to the living room. Although he was later

---

[3] The Government did not claim in its brief that Rosebar was not in custody. At the evidentiary hearing, however, the Assistant United States Attorney stated that the Government did not concede that Rosebar was in custody.

given a shirt and pants, Rosebar was wearing a T-shirt and boxer shorts when he was found by the EST. As the EST members left the apartment, another team of approximately seven armed officers entered to conduct a search of his apartment. When he was questioned about the presence of guns or firearms, he was under the watch of Officer Taylor, in uniform, armed, and wearing a tactical vest, whose job was to remain in place to guard him for the duration of the search. Although Rosebar was not initially told that he was under arrest, no one told him that he was free to leave, and Officer Taylor acknowledged in his testimony that he would not have allowed Rosebar to leave had he tried. Once heroin was found, Officer Taylor formally placed him under arrest, handcuffed him, and escorted him to a police cruiser.

Under these circumstances, Rosebar could not reasonably have thought he was free to leave. In particular, the overwhelming show of force, including the EST officers who forced him to the living room, the multiple armed search team members entering the premises, and the presence of a uniformed police officer standing watch over him as he was questioned, rendered the brief interview custodial. *See Hashime*, 734 F.3d at 280-81, 284 (finding a custodial interrogation at a suspect's house based in large part on the "broader setting" of the encounter, which started when a team of 15-30 armed federal and state law enforcement agents descended upon the defendant's home equipped with a battering ram and "streamed into the house with their guns drawn," an officer woke the defendant with a gun pointed at him and ordered him to get up, and the officers ordered the defendant's family members outside, restricted their movements, and interrogated each of them individually); *United States v. Colonna*, 511 F.3d 431, 433, 435-36 (4th Cir. 2007) (finding a custodial interrogation where the defendant was awakened in his home when law enforcement officers kicked open the defendant's bedroom door and ordered him at gunpoint to dress and come downstairs, the defendant's home was

"inundated" by approximately 24 officers, and he remained under guard during questioning). Notably, Rosebar was never told that he was free to leave or that he did not have to answer the officer's question. *Colonna*, 511 F.3d at 436 (noting these factors in finding a custodial interrogation). Indeed, Officer Taylor candidly acknowledged that Rosebar was not free to leave when he testified that he would not have allowed it. Rather, Rosebar remained under guard by Officer Taylor at all times until he was formally arrested, only about 15 minutes after the questioning. *Id.* (considering constant presence of a guard in finding a custodial interrogation). In light of these circumstances, the Court finds that Rosebar was subject to a custodial interrogation when the detective questioned him, such that *Miranda* warnings were required.

### B. The Public Safety Exception

The Government asserts that even if Rosebar was in custody when the detective asked him whether there were guns or bombs in the apartment, the question was permissible because it falls under the public safety exception to the *Miranda* rule. In *New York v. Quarles*, 467 U.S. 649 (1984), the United States Supreme Court held that *Miranda* does not apply "to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Id.* at 656. The Supreme Court emphasized that this exception is a "narrow" one, crafted because, in the case before it, the officers "were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." *Id.* at 657-58. The narrowness of the exception was underscored by the United States Court of Appeals for the Fourth Circuit in *United States v. Mobley*, 40 F. 3d 688 (4th Cir. 1994). There, the Fourth Circuit emphasized that public safety is an "exception" to the *Miranda* requirement and held that it applies only when there is "an objectively reasonable need to protect the police or the public from any immediate

danger associated with a weapon." *Id.* at 692 (quoting *Quarles*, 467 U.S. at 659 n.8). As the facts of *Quarles* suggest, and as *Mobley* echoes, the public safety exception is borne of exigency, allowing police officers to ask only "questions necessary to secure their own safety or the safety of the public" when they reasonably believe such safety is at risk. *Quarles*, 467 U.S. at 658.

In *Mobley*, which also involved execution of a search warrant for drugs, approximately eight law enforcement agents entered the suspect's apartment, conducted a security sweep, and concluded that Mobley was the only person present. 40 F.3d at 690, 693. Because Mobley had been naked when initially encountered, there was no legitimate concern that he was concealing a weapon on his person. *Id.* at 693. He was then asked if there were any weapons in the apartment, to which he responded by acknowledging that there was a weapon in the bedroom closet. *Id.* at 691. Under these facts, the Fourth Circuit concluded that the case was indistinguishable from "an ordinary and routine" search and arrest, so the public safety exception did not apply. *Id.* at 693.

*Mobley* controls here. As in *Mobley*, Rosebar was the subject of a sudden entry by a large number of armed officers who conducted a security sweep and determined that they had found and secured all individuals on the premises. Rosebar, wearing a tank top and boxer shorts, could not reasonably be thought to be concealing a weapon. Thus, with the apartment secured, Rosebar under close watch, and law enforcement greatly outnumbering him, when Rosebar was asked essentially the same question asked in *Mobley*, there was no basis for the public safety exception to apply. *Id.*

The Government seeks to distinguish *Mobley* based on the fact that there, the suspect was asked about weapons on the premises "[a]s he was being led away," *id.* at 693, while here, the question was posed as the search team arrived on the scene. But the Fourth Circuit's key

concern in *Mobley* was not how far along the arrest process had gone, but whether there was evidence of an "immediate danger" that would justify the question. *Id.* at 693. Significantly, as in *Mobley*, the EST officers had already completed their protective sweep for individuals and were departing when the question was asked.

The Government further asserts that the fact that "firearms are frequently associated with drug dealers" is enough to establish the immediate danger necessary for the public safety exception. Resp. in Opp'n at 8, ECF No. 26. *Mobley* rejected that proposition. In response to the Government's assertion in that case that the officer's question was permissible because there is a known nexus between drug dealing and firearms, the Fourth Circuit clarified that "[a]bsent other information, a suspicion that weapons are present in a particular setting is not enough to demonstrate an objectively reasonable concern for immediate danger to police or public." *Mobley*, 40 F. 3d at 693 n. 2. Here, the Government has offered no evidence that the detective had a particular reason to believe that Rosebar had a firearm, and certainly no evidence that he had a particular reason to believe there was a bomb on the premises. There was no evidence that the officers had reviewed Rosebar's criminal record to determine whether he had a history of committing crimes involving firearms or violence, and when they encountered him, Rosebar offered no resistance and did not make any furtive or quick movements.

By contrast, in the cases relied upon by the Government, questions about weapons were permissible under the public safety exception in part because either the officers had specific information that the suspect in question may have a firearm, or they observed suspicious or furtive movements raising a reasonable concern that the suspect was reaching for a firearm. *See, e.g., United States v. Reilly*, 224 F.3d 986, 993 (9th Cir. 2000) (upholding question regarding weapons where suspect brought his hands to his waistband, where weapons are frequently

8

concealed); *United States v. Are*, 590 F.3d 499, 505-07 (7th Cir. 2009) (upholding question about weapons where officers had information that the defendant had been arrested before on a weapons charge); *United States v. Young*, 58 Fed. App'x 980, 981-82 (4th Cir. 2003) (upholding question about weapons because the officer knew that the suspect had prior arrests for violent crimes, the premises had not yet been secured, and the suspect had not yet been frisked); *United States v. Coleman*, 175 F.3d 1016, 1999 WL 147262, at *2 (4th Cir. Mar. 18, 1999) (upholding question about gun where the defendant was a murder suspect with a history of violence, and the arrest occurred in a public area); *United States v. Brown*, 153 F.3d 722, 1998 WL 480748, at *1 (4th Cir. Aug. 6, 1998) (upholding questioning about the presence of weapons because the suspect leaned into the residence upon seeing the officers approaching, and the officer was aware that the defendant had a prior criminal history involving firearms).

Although the Government cites authority from other circuits that may take a more permissive approach to the public safety exception, *see, e.g.*, *Reilly*, 224 F.3d at 993; *Are*, 590 F.3d at 505-07, *Mobley* is both controlling authority in this Circuit and on point factually. With nothing more than a general link between drug dealing and firearms, the Government cannot establish that, under these facts, there was in Rosebar's apartment an "immediate necessity of ascertaining the whereabouts of a gun" or other weapon for purposes of public safety. *Quarles*, 467 U.S at 657-58. The Court therefore finds that, in the absence of *Miranda* warnings, the question was impermissible, and that Rosebar's answer to that question must be suppressed. *Mobley*, 40 F.3d at 693.

## II.    Involuntary Statement

Rosebar also argues that his statement should be suppressed because it was made involuntarily, in violation of the Fifth Amendment's Due Process Clause. Because the Court grants the Motion to Suppress based on the lack of *Miranda* warnings during a custodial interrogation, it need not reach this issue.[4]

## CONCLUSION

The Court finds that (1) Rosebar was in custody when he was asked by the detective if there were any guns or bombs in the apartment, and (2) the detective's question was not permissible under the public safety exception to the *Miranda* requirement. The Motion to Suppress is therefore GRANTED on the basis of the *Miranda* violation, and the statement is SUPPRESSED. A separate Order follows.

Date: May 15, 2015

THEODORE D. CHUANG
United States District Judge

---

[4] Rosebar has also asserted that the statement should be suppressed because it derived from the allegedly unlawful search warrant he challenged in his separately filed Motion to Suppress Tangible and Derivative Evidence. Because the Court denied that motion on April 15, 2015, the statement is not subject to suppression on that basis.